**UNITED STATES of America, Appellee,**

v.

**Richard Lamont GARTMON, Appellant.**

No. 96–3102.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 9, 1997.

Decided July 14, 1998.

Paul L. Knight, appointed by the court, argued the cause and filed the briefs for appellant.

James E. Boasberg, Assistant U.S. Attorney, argued the cause for appellee, with whom Eric H. Holder, Jr., U.S. Attorney at the time the brief was filed, John R. Fisher, Roy W. McLeese, III, Katherine Winfree, and Douglas F. Gansler, Assistant U.S. Attorneys, were on the brief.

Before: EDWARDS, Chief Judge, HENDERSON and GARLAND, Circuit Judges.

GARLAND, Circuit Judge:

Appellant Richard Gartmon was convicted of interstate transportation of securities obtained by fraud and of money laundering in connection with a scheme to defraud the George Washington University Health Plan. Gartmon challenges his convictions on the grounds that: (1) the trial court improperly admitted evidence of his physical and verbal intimidation of a confederate; (2) the prosecution made improper statements during closing arguments; (3) the trial court erred in not declaring a mistrial after federal agents spoke with an excused alternate juror who subsequently was re-empaneled; and (4) the evidence was insufficient to establish venue in the District of Columbia on most of the money laundering counts. He also contends, and the government agrees, that the sentence he received on the money laundering counts exceeds the maximum permitted by statute. We affirm Gartmon's convictions against all of his challenges and remand the case for correction of the sentence.

## I

On December 11, 1995, a grand jury in the District of Columbia indicted Gartmon, Donna Rouse, and Pamela Glascoe on charges of interstate transportation of securities taken by fraud, in violation of 18 U.S.C. § 2314, and of money laundering, in violation of 18 U.S.C. § 1956(a)(1).[1] Gartmon and Rouse proceeded to trial, while Glascoe pled guilty and testified for the United States.

According to the government's evidence, Pamela Glascoe first met Richard Gartmon in November 1994. At the time, Glascoe worked as a secretary in the marketing and sales department of the George Washington University Health Plan (GWUHP or George Washington), a health maintenance organization located in Bethesda, Maryland. Among other activities, Glascoe's department sponsored various health-related special events.

Gartmon and Glascoe soon began dating. The morning after their first date, Gartmon asked Glascoe for money to invest, and shortly before Christmas she gave him $850. When she asked him to return some of the money in order to buy her daughter Christmas presents, he told her she was not a "woman of execution" and asked her whether there was a way she could get more money for him. Glascoe then told Gartmon about the special events GWUHP

---

1. Gartmon, alone, was also charged with subornation of perjury, in violation of 18 U.S.C. § 1622. The jury acquitted Gartmon on that charge.

sponsored, and Gartmon proposed the idea of a "hair show"—a competition between hair salons. When Glascoe was unable to secure GWUHP's sponsorship of such an event, Gartmon again criticized her failure of "execution." On her own, Glascoe then submitted a forged request to GWUHP for a $12,500 check, payable to Gartmon, for a fictitious "run-a-thon." George Washington's finance department cut the check and Glascoe delivered it to Gartmon.

Although Glascoe told Gartmon she did not want to submit any more fraudulent check requests to GWUHP, in early January he again told her he needed money to invest. Gartmon provided the names of suggested payees including codefendant Rouse—all former or current girlfriends of his, with the exception of one payee who was a cousin— and Glascoe forged the authorizing signatures on the check requests. After the initial "run-a-thon" check, Glascoe submitted eight more check requests from January to March 1995, in amounts ranging from $3,600 to $8,600. After receiving the checks, she delivered them to Gartmon, who in turned delivered them to the payees. The payees cashed the checks—one at a bank in the District of Columbia, the rest at banks in the suburbs— and gave the money to Gartmon.

Gartmon and Glascoe also developed a second scheme to defraud George Washington. Gartmon procured blank invoices from a printing company called Underground Printing, and Glascoe filled out and submitted the invoices requesting payment from George Washington for the performance of fictitious printing services. Pursuing this scheme from January to March, 1995, Glascoe obtained eight additional GWUHP checks, in amounts ranging from $16,825.80 to $84,603.40. At Gartmon's instruction, Glascoe made Rouse the payee on all of the checks. Glascoe delivered the checks to Gartmon, and all were deposited in a bank account in Rouse's name. One of the checks was deposited in the District of Columbia; the rest were deposited in the suburbs. All of the GWUHP checks involved in both schemes were drawn on an account GWUHP maintained with Riggs National Bank of Washington, D.C., which processed all checks cashed outside of the District of Columbia at its operations center in the District.

In late February 1995, in the midst of these schemes, Glascoe called Gartmon from work and told him she did not want to continue defrauding her employer. Gartmon asked her to leave work and come to his house because he was sick and needed medicine. According to her testimony, when she arrived and entered his bedroom, Gartmon "told me to take off my clothes and lay down in the bed with my head at the foot of the bed. . . . [H]e . . . told me to open up my legs and he put a gun up my vagina. . . . He told me that I will listen to everything he says and do as he says." Trial Tr. 353–54 (Mar. 14, 1996). Thereafter, Glascoe continued to submit fraudulent check requests to GWUHP.

Gartmon used the money obtained from George Washington to purchase a hair salon, three sports cars, and a Jacuzzi and gazebo for his house—putting title in the names of other people or using checks drawn on the Rouse account. He also used two Rouse checks to loan $30,000 to an acquaintance, Sandra Yates, in exchange for cash repayment (with $4,500 in interest) within two months. Some time later, Yates met with Gartmon in a parking lot to discuss another loan. He told her to get in his car, and then drove away so quickly as to frighten her. When they reached Gartmon's home, he asked her to lift her skirt so he could determine whether she was wearing a "wire" for recording the conversation. He then warned her that if she were setting him up, he would kill her.

In March 1995, George Washington fired Glascoe after discovering that she was forging check requests. After speaking with the FBI, Glascoe agreed to tape-record telephone conversations with Gartmon. In the taped conversations, Gartmon implicated himself and used profane and abusive language. Eight of the conversations were admitted into evidence and played to the jury.

Gartmon did not testify in his own behalf. Instead, he called two employees from the hair salon he purchased, who testified that in the spring of 1995 they recalled meeting with a woman from GWUHP regarding health

insurance. Gartmon also called a comedian who testified that he performed at a hair show in Maryland in late 1994 or early 1995, and that he heard the show was sponsored by GWUHP. Finally, Gartmon called his mother and sister to testify that they had seen Glascoe in the presence of three of Gartmon's children. The latter testimony was offered to impeach Glascoe who had testified that she thought Gartmon had only one child. In closing argument, defense counsel contended that Gartmon did not know Glascoe had obtained the GWUHP checks by fraud, and that Glascoe perpetrated the fraud on her own in order to benefit from the money Gartmon received.

## II

■ Gartmon challenges the trial court's admission of Glascoe's testimony regarding the gun incident in his bedroom, and its admission of the telephone conversations tape-recorded by Glascoe. Admission of this evidence, he contends, violated Federal Rule of Evidence 403, which states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...." The standard of review applicable to these determinations by the district court is abuse of discretion. *See Old Chief v. United States,* 519 U.S. 172, 117 S.Ct. 644, 647 n. 1, 651 n. 7, 136 L.Ed.2d 574 (1997). It is a standard we apply "most deferentially." *United States v. Rezaq,* 134 F.3d 1121, 1137 (D.C.Cir.1998), *petition for cert. filed, Rezaq v. U.S.,* No. 97–9019 (May 7, 1998). We find no such abuse here.

### A

With respect to the gun incident, Gartmon contends both that the court never conducted any balancing of the incident's probative value and prejudice, and that if it had, admission of Glascoe's testimony would have come out on the short end of such a balance.

Gartmon's first contention is wrong on the facts because the district court plainly did conduct a balancing. Prior to trial, Gartmon filed a motion *in limine* seeking to exclude

this evidence on the ground that it violated Rule 403, as well as on the ground that it violated Federal Rule of Evidence 404(b), which bars evidence of other crimes offered to prove a defendant's character "in order to show action in conformity therewith." The district court conducted a hearing, which explored both the Rule 404(b) question and the question of the incident's probative value and potential prejudicial effect under Rule 403. Citing our decision in *United States v. Allen,* 960 F.2d 1055, 1058 (D.C.Cir.1992), the district court ruled that the evidence did not fall within the coverage of Rule 404(b) because it was not an "other crime," but instead was "inextricably intertwined" with the conduct charged in the indictment. *See* Mem. Order at 2, 6.[2] With respect to Rule 403, the court said it was "satisfied that in the 403 balancing analysis the probative value of this evidence outweighs the prejudice to the defendant." *Id.* at 6. In reaching this conclusion, the court noted that the incident "both illuminates why Glascoe would continue to defraud her employer on behalf of Gartmon, as well as demonstrating the manner in which Gartmon committed the crimes for which he was indicted." *Id.* at 3; *accord id.* at 6 & n. 5. This record is more than sufficient to establish that the district court conducted the balancing contemplated by Rule 403.

■ We also find no abuse of discretion in the district court's substantive determination that the balance came out in favor of admission of the testimony. The probative value of the incident is plain. It constituted direct evidence of Gartmon's knowing involvement in, and direction of, the scheme to defraud George Washington. And by making clear the nature of the relationship between Gartmon and Glascoe, it went a long way toward explaining why a woman who did not benefit monetarily would have entered into and continued in the scheme charged in the indictment. In so doing, the testimony rebutted Gartmon's contention that Glascoe's motive was personal monetary gain independent of any influence of his. Although Glascoe conceded that the incident "wasn't the whole reason" she continued with the scheme, she said that "it was a part of it." Trial Tr. 470

**2.** Gartmon does not press the Rule 404(b) claim    here.

(Mar. 15, 1996). If anything, her honest admission of mixed motives simply adds to the credibility, and probativeness, of her testimony.

■ But even if the evidence were probative, Gartmon claims, it was simply too prejudicial to be admitted. As proof, Gartmon cites the district court's own characterization of the gun incident, at sentencing, as "outrageous[ ]." Sentencing Tr. 79 (Aug. 12, 1996). There is no question but that the conduct portrayed by the testimony was outrageous, and that it may dramatically have injured Gartmon's cause. But that is not sufficient reason to exclude the testimony. *See United States v. Munoz,* 36 F.3d 1229, 1233 (1st Cir.1994). Rule 403 does not provide a shield for defendants who engage in outrageous acts, permitting only the crimes of Caspar Milquetoasts to be described fully to a jury. It does not generally require the government to sanitize its case, to deflate its witnesses' testimony, or to tell its story in a monotone. *Cf. Old Chief,* 117 S.Ct. at 656 ("[T]he prosecutor's choice will generally survive a Rule 403 analysis when a defendant seeks to force the substitution of an admission for evidence creating a coherent narrative of his thoughts and actions in perpetrating the offense for which he is being tried."). It does not bar powerful, or even "prejudicial" evidence. Instead, the Rule focuses on the "danger of *unfair* prejudice," and gives the court discretion to exclude evidence only if that danger *"substantially* outweigh[s]" the evidence's probative value. *See* FED. R. EVID. 403 (emphases added).

Quoting the Advisory Committee's Notes to Rule 403, the Supreme Court has explained that the term "unfair prejudice" means " 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.' " *Old Chief,* 117 S.Ct. at 650. Gartmon contends this incident had that effect here, inciting the jury to convict him not because of the fraud, but because of his behavior toward Glascoe.

We should note first that the testimony at issue was not offered for an unfair purpose. It was not offered on an ancillary issue or to inflame the jury. To the contrary, it was offered as evidence of defendant's intent and controlling role in the fraud, and in direct rebuttal to his claim that he had neither. If the jury believed the testimony, a conviction would be fully justified.

■ Of course, the fact that the testimony was not offered for an unfair purpose does not mean a juror could not have used it for one. But because the "natural use of the testimony would be for its appropriate use, proving intent," *United States v. Moore,* 732 F.2d 983, 991 (D.C.Cir.1984), we are loath to upset the determination of the trial court. Although there may have been some risk that a recitation of the facts of the incident would evoke emotions in the courtroom, that risk was comparatively small, and it alone did not render the testimony "unfair" or "substantially outweigh[ ]" its probative value. As we said in *Moore,* "the balance [under Rule 403] should generally be struck in favor of admission when the evidence indicates a close relationship to the event charged." *Id.* at 989.

Defendant's trial counsel conceded as much. At a time when he did not know whether the incident occurred before or after all the fraudulent check requests had been submitted to George Washington, counsel agreed that if the incident had occurred before, "[i]t would be a much more difficult argument to make that the prejudicial impact substantially outweighed the probative value...." Trial Tr. 36 (Mar. 12, 1996). Although counsel did say that he "would nevertheless make that argument," *id.,* his honest appraisal of the difficulty of his position was correct.

**B**

As with the gun incident, Gartmon moved *in limine* to exclude the recordings of his telephone conversations with Glascoe. The court ruled that they were admissible as admissions of a party opponent pursuant to Federal Rule of Evidence 801(d)(2)(A) and rejected Gartmon's contention that they were barred by Rule 403 because of their tone and profanity. The prosecution played portions of eight of the telephone calls to the jury. In the calls, Gartmon used profane and abusive language towards Glascoe. Gartmon once

again contends that the trial judge never conducted a Rule 403 balancing and that an appropriate balancing must come out in his favor.

█ It is true that, in contrast with its treatment of the gun testimony, the district court did not issue an opinion explicitly balancing the prejudice and probative value of the recordings or explicitly announcing that the balance favored admission of the evidence. The hearing transcript makes plain, however, that the court well-understood the need to balance prejudice and probativeness, and that its ultimate conclusion that the material was admissible was based on the result of such a balancing. *See* Hr'g Tr. 163–64 (Mar. 7, 1996). We do not require a district court to recite the formula of Rule 403 *in haec verba* in order to be sustained. *See*

*United States v. Bradshaw*, 935 F.2d 295, 301 (D.C.Cir.1991). Indeed, " '[a]s long as it appears from the record as a whole that the trial judge adequately weighed the probative value and prejudicial effect . . ., we conclude that the demands of Rule 403 have been met.' " *Id.* (quoting *United States v. Sangrey*, 586 F.2d 1312, 1315 (9th Cir.1978)). It is apparent that the trial judge did so here.

█ It also is apparent that the court did not abuse its discretion in admitting the tape recordings. The tapes were probative because they revealed Gartmon's consciousness of guilt. For example, Glascoe told Gartmon that she had retained a lawyer to represent her in the investigation, and they discussed what Glascoe should tell the lawyer about the checks paid to co-defendant Rouse, purportedly for the work of Underground Printing:

Glascoe: Suppose he asks me, "Where did the checks come from?"

. . .

Gartmon: I mean, that's what you gotta be creative at. I mean, you gotta know what you did. I mean, just tell him you sent them out. Tell him. . . . Just, just, let's simply tell him that they were a black minority company that you were giving a break to, that you were trying to help out.

. . .

Gartmon: And they're gonna ask why weren't they made out to the company and you just simply tell them that it wasn't made out to the company for the reason that um, that his company a year before last had a problem with the Internal Revenue Service and that was their way of doing it. And that's the way he decided they're doin' it.

. . .

Glascoe: What about the receipts? . . . You know, the receipts that I got, from Underground. I want them, I don't want it to say that you gave me. . . . You want me to say you gave them to me?

Gartmon: No, I, you don't put my name in it at all.

---

Appellant's App. at 79–81.

On the other side of the balance, the tapes did not disclose any unrelated crimes or conduct that might have unfairly prejudiced the jury against Gartmon. And whatever minor prejudice may have been risked by the fact that he "raise[d] his voice to Ms. Glascoe and use[d] profanity," Gartmon Br. at 27, it was appropriately mitigated by a limiting instruction the court gave to the jury. Although the instruction did not track the original language proposed by Gartmon's counsel, the court crafted the final instruction with the aid of both the defense and prosecution, and Gartmon's counsel did not object to its final

formulation. *See, e.g., United States v. Small,* 74 F.3d 1276, 1284 (D.C.Cir.1996).

### III

Gartmon contends that in their closing arguments, the prosecutors improperly called him a liar and an abuser of women and, in connection with the latter, improperly emphasized the gun incident and the tape recordings. He also contends that the prosecutors mischaracterized the evidence regarding both the threat he made to Sandra Yates and the gun incident, and that they then compounded their misconduct by misstating Glascoe's testimony about the latter.

■■■ Because Gartmon failed to raise these objections below, we review his challenge for plain error under Federal Rule of Criminal Procedure 52(b). *See United States v. Young,* 470 U.S. 1, 6, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); *Small,* 74 F.3d at 1281. The Supreme Court has explained that under this standard, "there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.'" *Johnson v. United States,* 520 U.S. 461, 117 S.Ct. 1544, 1549, 137 L.Ed.2d 718 (1997) (quoting *United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). The third element "in most cases ... means that the error must have been prejudicial: It must have affected the outcome of the district court proceedings." *Olano,* 507 U.S. at 734, 113 S.Ct. 1770. Moreover, "[i]t is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." *Id.* Finally, "[i]f all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Johnson,* 117 S.Ct. at 1549 (quoting *Olano,* 507 U.S. at 732, 113 S.Ct. 1770) (other citations omitted). It is not likely an error can have that effect where the evidence against the defendant is "overwhelming," the Court has said, because reversal in such an instance would itself seriously affect the fairness, integrity and public reputation of judicial proceedings. *See id.* at 1550. Applying this test, we readily dismiss most of Gartmon's challenges to the government's summations.

### A

■■■ First, it was not error for the prosecution to call Gartmon a liar, or to describe various of his statements and actions as "lies." We do not, of course, condone the use of insults or slurs in lawyers' arguments. But here the words were not used as free-floating allegations about Gartmon's character or as expressions of the prosecutor's opinion. Rather, they were tied to specific conduct at issue in the trial— ranging from the falsehoods Gartmon told Glascoe in order to control her, to the false claims for compensation they submitted to George Washington. *See, e.g.,* Trial Tr. 1168 (Mar. 25, 1996) ("That letter [to GWUHP] was a complete and utter lie because Richard Gartmon had no intention of using that money for the ... hair show ...."); *see also id.* at 1165–69, 1183, 1187. When a "lie" is an accurate description of the conduct at issue, we will not reverse a conviction because the prosecutor did not use a more delicate term. *See United States v. Donato,* 99 F.3d 426, 432 (D.C.Cir.1996) (upholding conviction where prosecutor called defendant charged with fraud a liar); *United States v. Dean,* 55 F.3d 640, 665–66 (D.C.Cir.1995) (same, where defendant charged with perjury).

■■■ Nor was it error for the prosecution to say that Gartmon abused women and to refer to the gun incident and phone calls as examples of that abuse. Again, the rhetoric was not used as a generalized attack on Gartmon's character, but as a description of the manner in which he conducted the scheme charged in the indictment—that is, by abusing his relationship with Glascoe and the other women who served as fictitious payees. *"[T]he way he got the money,"* the prosecutor said, "was by using and abusing the people closest to him—girlfriends, cousins, friends, associates." Trial Tr. 1045 (Mar. 25, 1996) (emphasis added). Moreover, the prosecutor tied this allegation directly to the evidence the jury had just heard: "We heard how he did it over the last two weeks," the prosecutor said, and then detailed the specific ways in which Gartmon used his girlfriends in the fraudulent scheme. The prosecutor also reminded the jury of the testimony that when Gartmon was arrested, he admitted to the FBI that he made his money "through his girlfriends." Trial Tr. 973–74 (Mar. 20, 1996). And because we have upheld the district court's admission of the gun incident and the tape recordings, there was no error in the prosecution's refer-

ence to this evidence and suggestion that the jurors review it.[3]

■ Finally, to the extent Gartmon's argument on these points rests on an allegation that the tone rather than the substance of the prosecution's remarks inflamed the jury, we simply are not in a position to make such an assessment and instead must "grant great deference to the district court's judgment as to '[w]hether the prosecutor has struck a foul blow instead of just a hard one.'" *United States v. Gatling*, 96 F.3d 1511, 1524 (D.C.Cir.1996) (quoting *Dean*, 55 F.3d at 665). However, the fact that the prosecution's argument did not draw a contemporaneous objection from defense counsel, or a sua sponte admonition from the trial court, is a substantial indication that the tone was not inappropriate.

**B**

■ Gartmon also contends that the prosecution mischaracterized the trial evidence by saying that Gartmon "kidnaped" Sandra Yates when he drove her to his home, *see* Trial Tr. 1077 (Mar. 25, 1996), and by referring to the gun incident involving Pamela Glascoe as a "rape," *see id.* at 1048. Although "kidnaping" may not have been a technically accurate description of the wild car ride, in context it is clear that the prosecutor used the word in a figurative sense and that there was no ambiguity about the precise incident to which he was referring. "Rape," on the other hand, may well have been a technically accurate description of

what Gartmon did to Glascoe. *See* D.C.Code Ann. §§ 22–4102, 22–4103. What is more important, however, is that the prosecutor's meaning and reference were again clear. Given that clarity, the use of the terms was not error, and in any event could not have constituted plain error as it could not have "affected the outcome" of the proceeding. *See Olano*, 507 U.S. at 734, 113 S.Ct. 1770.

■ Gartmon further contends that the prosecution misstated Glascoe's testimony regarding the gun incident, specifically regarding the threat he made to force her to continue submitting fraudulent check requests. The prosecution, he notes, told the jury that Glascoe testified Gartmon said: "If you don't keep doing it, I'm going to pull the trigger." Her actual testimony, by contrast, was: "He told me that I will listen to everything he says and do as he says." *Compare* Trial Tr. 1048 (Mar. 25, 1996), *with* Trial Tr. 353–54 (Mar. 14, 1996). Gartmon is correct that there was a misstatement. Moreover, because it constituted a "'statement[] of fact to the jury not supported by proper evidence introduced during trial,'" the prosecutor's "remarks were error to the extent that they overstated [Glascoe's] testimony." *United States v. Perholtz*, 842 F.2d 343, 360 (D.C.Cir.1988) (quoting *Gaither v. United States*, 413 F.2d 1061, 1079 (D.C.Cir.1969)); *accord Donato*, 99 F.3d at 432. This is so "[w]hether or not those [remarks] were slips of the tongue in the heat of oral argument." *United States v. North*, 910 F.2d 843, 896 (D.C.Cir.1990).[4]

---

**3.** Gartmon also contends that one of the prosecutors stated her opinion that Glascoe was a "bad person." In fact, the prosecutor's remarks were made in rebuttal to defense counsel's contention that Glascoe, not Gartmon, was the criminal actor in the scheme. The prosecutor's response was to indicate that Glascoe's behavior was no excuse for Gartmon's, and that the testimony showed both were complicit in the fraud:

> [W]hat [defense counsel] wants you to do is to rely on Pamela Glascoe for the things that make her look really really bad, but not to rely on Pamela Glascoe for the things that make Richard Gartmon look really really bad, and there's a lot of both of those things, because you know what? They're both bad.

Trial Tr. 1164 (Mar. 25, 1996).

**4.** The misstatement does in fact appear to have been a slip of the tongue. Apparently Glascoe originally described the incident to the government in the form recited by the prosecutor; that was the form of the expected testimony the government recited in its Rule 404(b) notice, *see* Gov't App. at 41–42; and the trial judge described it in the same way in his opinion on defendant's motion to exclude the testimony, *see* Mem. Order at 3. The absence of any objection by defense counsel suggests that both parties were confused as to what Glascoe actually had said in court.

Although the prosecution's misstatement was error, we still must determine whether it was plain error. *See Young,* 470 U.S. at 6, 14, 105 S.Ct. 1038; *United States v. Boyd,* 54 F.3d 868, 872 (D.C.Cir.1995). In making that determination, the critical question is whether the error prejudiced defendant in a way that affected the outcome of the trial. *See Olano,* 507 U.S. at 734, 113 S.Ct. 1770; *see also Young,* 470 U.S. at 12, 105 S.Ct. 1038 ("[T]he Court must consider the probable effect the prosecutor's [statement] would have on the jury's ability to judge the evidence fairly."). This court has used a relatively consistent set of criteria for evaluating the potential prejudice of closing argument errors. We have

> generally looked to three factors in determining whether improper remarks by the prosecutor sufficiently prejudiced a defendant: "the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." We have also framed the test for prejudice in terms of the severity of the prosecutor's misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the improper remarks.

*North,* 910 F.2d at 895 (citations omitted). We have applied these factors—severity, centrality, mitigation, and closeness of the case—regardless of whether the context was review for harmless error because defense counsel objected at trial, or for plain error because he did not.[5] *Compare, e.g., Gaither,* 413 F.2d at 1079–80 (harmless error review), *with Perholtz,* 842 F.2d at 361 (plain error review).[6] Applying these factors here, we conclude that the prosecution's misstatement did not prejudice Gartmon in the outcome of his trial.

First, although Gartmon complains about many parts of the prosecution's argument, we have concluded above that only the misquotation of Glascoe constituted error. That misquotation was made only once in a relatively lengthy argument. As we have previously held, "[w]ithout other compelling factors, a single misstatement confined to a closing argument rarely amounts to severe misconduct." *North,* 910 F.2d at 897; *cf. Perholtz,* 842 F.2d at 361.

Second, it is true that the issue affected by the error—whether Gartmon controlled or participated in the submission of the fraudulent requests by Glascoe—was central to the case. However, the *disparity* between the actual and the misstated testimony was not of central importance. The misquotation may well have been more powerfully put than Glascoe's actual words, although even that is not clear.[7] But if believed, either version would have been more than sufficient to establish Gartmon's intent and role in the offense.

Third, the judge gave the standard limiting instruction that lawyers' arguments are not evidence and that the jury's recollection of the evidence controls. We have repeatedly said this kind of instruction can mitigate the impact of erroneous jury argument. *See, e.g., Gatling,* 96 F.3d at 1524; *United States v. Childress,* 58 F.3d 693, 716 (D.C.Cir.1995); *Boyd,* 54 F.3d at 872; *North,* 910 F.2d at 897; *Perholtz,* 842 F.2d at 361.

Finally, this was not a close case. To the contrary, the evidence of Gartmon's guilt was overwhelming. In addition to Glascoe, six of the payees testified that they performed no services to justify receipt of checks from GWUHP, that Gartmon gave them the checks to cash, and that they returned almost all of the money to him. There was no

---

5. An important difference, however, is that the burden is on the government in the first instance and on the defendant in the second. *See Olano,* 507 U.S. at 734, 113 S.Ct. 1770.

6. We also have referred, in shorthand, to the application of these factors as a review for "substantial prejudice." *See, e.g., Small,* 74 F.3d at 1280.

7. Given the physical context in which the words were spoken, the unstated implication that "pulling the trigger" would be the consequence if Glascoe did not "do as he says" may have had an even more powerful impact on the jury than if Gartmon had made the threat expressly, as the prosecutor thought he had.

evidence that any of the special events for which GWUHP gave the checks occurred, or that the printing company performed any work for GWUHP beyond a single, $401.75 order of business cards. Gartmon presented virtually no defense. His lawyer's argument that Gartmon did not know of the fraud was incredible in light of the testimony of the payees, which he neither contested nor explained except to argue that Gartmon did not "treat all those people right." Trial Tr. 1104 (Mar. 25, 1996). Viewed against this background, there is no possibility that the difference between Glascoe's actual and quoted testimony could have made a difference in the trial's outcome.

## IV

After the court read its final instructions to the jury, it excused the six alternate jurors, including Juror No. 2. At that point, counsel for Gartmon's co-defendant noted that one of the unexcused jurors had displayed enormous displeasure at being selected and asked the court to remove him. With the agreement of all counsel, the court told the jury that it had made a mistake in designating the alternates, excused the disgruntled juror, and recalled Juror No. 2 who was still in the hall outside. The jury retired to the jury room at 2:00 p.m. After learning that an FBI case agent and postal inspector had spoken with Juror No. 2 while he was in the hall, the prosecution advised the court, which at 2:20 p.m. directed the jury to stop deliberating.

The court immediately conducted a hearing regarding the possible prejudice flowing from this contact. The FBI agent, corroborated separately by the postal inspector, testified that when the group of excused alternates came out of the jury room the agent thanked them and asked, "Is there anything the government could have done to make the case better or more understandable?" Trial Tr. 1282 (Mar. 26, 1996). Juror No. 2 then nodded his head, laughed and said, "Yeah, I've got questions, a lot of questions." *Id.* at 1287. The postal inspector asked what kind of questions. Referring to codefendant

Rouse, Juror No. 2 said he wondered what kind of knowledge Rouse had and what Gartmon had told her. *See id.* at 1282–83. The FBI agent said "okay" once or twice. At that point, the courtroom deputy came down the hall and the conversation with Juror No. 2 ceased.

After this testimony, the court denied Gartmon's initial request for a mistrial. At the request of both the government and defense counsel, and with their help in phrasing questions, the court then asked Juror No. 2 whether he had spoken with anyone after his dismissal from the jury, whether that contact influenced his ability to proceed with deliberations, and whether he had told the other empaneled jurors about the contact. Juror No. 2 related the same story as the federal agents, stated that it would not affect his ability to deliberate because he had his own mind, and said that he had not told the other jurors of the incident. Gartmon again moved for a mistrial. The court denied Gartmon's motion, finding that there was no discrepancy between the accounts of the three parties to the conversation, that neither agent said anything inappropriate to Juror No. 2, that the agents did not respond to the questions of Juror No. 2, and that it was clear that Juror No. 2 could still be fair and impartial. *See id.* at 1317–20.

Appellant contends that the district court erred in not declaring a mistrial. Both appellant and the government agree that the standard of review is for abuse of discretion by the district court. *See United States v. Williams*, 822 F.2d 1174, 1188 (D.C.Cir.1987). Gartmon argues that the government is unable to overcome "the heavy burden of rebutting the presumption of prejudice arising from" the contact with the agents. *See* Gartmon Br. at 33. His legal analysis is based on the Supreme Court's opinion in *Remmer v. United States,* which held that "any private communication . . . with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial." 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954). The "presumption is not conclusive," the Court said, "but the bur-

den rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." *Id.*

The government argues that *"Remmer's* presumption of prejudice no longer applies; instead, the trial court determines whether a likelihood of prejudice exists before assigning the government the burden of proving harmlessness." Gov't Br. at 46. But notwithstanding the view of the Sixth Circuit that *Remmer* is no longer controlling because of the Supreme Court's subsequent decision in *Smith v. Phillips,* 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), *see United States v. Pennell,* 737 F.2d 521, 532 (6th Cir.1984), many of our cases have continued to recognize the presumption of prejudice and to place the burden of disproving it on the government. *See United States v. Butler,* 822 F.2d 1191, 1195–96 & n. 2 (D.C.Cir.1987) (discussing *Phillips* and *Pennell*); *see also United States v. Fafowora,* 865 F.2d 360, 363 (D.C.Cir.1989); *Williams,* 822 F.2d at 1188. On the other hand, the government correctly points out that in *United States v. Williams–Davis,* 90 F.3d 490 (D.C.Cir.1996), *cert. denied,* ––– U.S. ––––, 117 S.Ct. 986, 136 L.Ed.2d 867 (1997), this court questioned the continued breadth of *Remmer,* suggesting that subsequent Supreme Court cases, including *Smith v. Phillips* and *United States v. Olano,* seem to have "narrow[ed]" or "reconfigure[d]" the *Remmer* presumption. *See* 90 F.3d at 496. The *Williams–Davis* court suggested that the cases no longer treat the presumption "as particularly forceful," and approved the Fourth Circuit's view that " 'while a presumption of prejudice attaches to an impermissible communication, the presumption is not one to be casually invoked.' " *See id.* at 496–97 (quoting *Stockton v. Commonwealth of Virginia,* 852 F.2d 740, 745 (4th Cir.1988)).

We need not resolve this debate, nor any tension in our own cases, in order to dispose of Gartmon's challenge. Here, the district court followed *Remmer* to the letter. As *Remmer* directed, the district court "determine[d] the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Remmer,* 347 U.S. at 230, 74 S.Ct. 450. On the basis of that hearing, and particularly on the basis of its appraisal of the credibility of the juror's statement that he had not been influenced, *see* Trial Tr. 1310 (Mar. 26, 1996), the court found no prejudice even on the *Remmer* standard, *see id.* at 1314 (indicating that "even though there may be a presumption of prejudice," it was overcome); *see also id.* at 1313–16. On appeal, this court gives substantial deference to a district court's appraisal of whether a juror contact resulted in prejudice to the defendant. *See Fafowora,* 865 F.2d at 363; *Butler,* 822 F.2d at 1196; *Williams,* 822 F.2d at 1188–89. We have no difficulty sustaining the district court's determination in this case.

The context of the contact with Juror No. 2 belies Gartmon's assertion that prejudice always arises "from a contact by a federal law enforcement officer" because an "agent is a scary person to the average layman." Gartmon Br. at 34. Here, the contact occurred in a non-threatening setting, with several fellow alternates present, after an accidental meeting in the hall, and after both sides thought the juror's service had concluded. The agents' questions were innocuous, communicating no threats or effort to influence the juror. *See Butler,* 822 F.2d at 1196; *Williams,* 822 F.2d at 1189. Nor was any extra-judicial information passed to the juror. *See Butler,* 822 F.2d at 1196. Indeed, the circumstances here do not even approach those in other, far more egregious cases in which this court has sustained findings of an absence of prejudice. *See, e.g., Williams–Davis,* 90 F.3d at 495, 497 (forewoman's husband urged her to "nail" the defendants); *Fafowora,* 865 F.2d at 363–64 (third party told juror he would give "anything" for information on deliberations); *Butler,* 822 F.2d at 1194–96 (defendant approached juror in elevator, complimented her, and told her his version of the events at issue; and where most of jury learned of the incident); *Williams,* 822 F.2d at 1186, 1189–90 (defense

witness contacted three jurors, inquired into status of deliberations, and complained that deliberations were only continuing so jurors could collect fees; and where entire jury learned of incident).

In addition to the context of the contact, we also have the juror's statement at the hearing that the contact would not influence him. *See Phillips,* 455 U.S. at 230 n. 7, 102 S.Ct. 940; *Butler,* 822 F.2d at 1196–97. The district court, having observed the demeanor of the juror, is in the best position to determine the credibility of that assurance. Moreover, the court's determination that the juror was credible is supported both by the nature of the agent's question to the juror, and by what the juror said in reply. "Yeah, I've got questions, a lot of questions," is not the kind of remark one would expect from a citizen who has been cowed by the presence of an FBI agent. Rather, it is consistent with his testimony that the conversation would not influence him because "I have my own mind." Trial Tr. 1310 (Mar. 26, 1996).

Finally, as in our assessment of potential prejudice from the prosecution's misstatements in closing argument, we are mindful of the fact that this case was not a close one. Measured against the overwhelming evidence of Gartmon's guilt, we are unable to view this contact as materially contributing to the verdict against him.

In addition to contending that the denial of his motion for mistrial was an abuse of discretion, Gartmon also contends that we should use our "supervisory power" to reverse his conviction because the agents' conduct violated District Court Rule 115. The government concedes that the agents violated that Rule, which provides that "[n]o ... person acting on behalf of a party or attorney, shall communicate directly or indirectly with a juror or an excused juror ... during the trial." D.C. Dist. Ct. R. 115(a). The Rule also bars communication after the verdict except with the express permission of the court, *see* D.C. Dist. Ct. R. 115(b). We analyze this violation under the plain error standard because Gartmon did not mention

either Rule 115 or the courts' supervisory power below. But the posture of our review is immaterial because the Supreme Court has instructed that we may not utilize our supervisory power to reverse a conviction unless the government's misconduct has prejudiced the defendant. *See United States v. Hasting,* 461 U.S. 499, 506, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983); *see also Bank of Nova Scotia v. United States,* 487 U.S. 250, 254, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988). As we already have sustained the district court's conclusion that Gartmon was not prejudiced, reversal of appellant's conviction would not be justified either under the plain error rule or as an exercise of our supervisory power.

## V

Appellant's remaining arguments relate to venue and sentencing. He contends that venue was insufficient for those money laundering counts where the GWUHP check was not first deposited in a District of Columbia bank, notwithstanding that Riggs National Bank processed all of the checks in the District. We may dispense with this contention without further discussion because Gartmon waived it by failing to raise it below. *See United States v. Gaviria,* 116 F.3d 1498, 1517 & n. 22. (D.C.Cir.1997), *cert. denied sub nom. Naranjo v. United States,* — U.S. —, 118 S.Ct. 865, 139 L.Ed.2d 763 (1998); *United States v. Rodriguez,* 67 F.3d 1312, 1317–18 (7th Cir.1995); *United States v. Potamitis,* 739 F.2d 784, 791 (2d Cir.1984); Charles Alan Wright, 2 Federal Practice and Procedure: Criminal 2d § 306 (2d ed.1982).

As the government concedes, however, Gartmon's objection to his sentence is valid. The district court sentenced Gartmon to 140 months to be served concurrently on all twenty-eight counts of conviction. Although that sentence was within the appropriate range for the thirteen money laundering counts, it exceeded the 120-month statutory maximum on the fifteen counts

charging interstate transportation of securities obtained by fraud. *See* 18 U.S.C. § 2314 ("Whoever transports [interstate securities obtained by fraud] ... [s]hall be ... imprisoned *not more than ten years*") (emphasis added). Accordingly, we accept the suggestion of both the defendant and the government that we remand the case for resentencing to correct this error.

## VI

For the foregoing reasons, we affirm the convictions and remand the case for re-sentencing in conformity with this opinion.