**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

  *Plaintiff-Appellant,*

v.

JAY E. LENTZ,

  *Defendant-Appellee.*

No. 02-19

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Gerald Bruce Lee, District Judge.
(CR-01-150-A)

Argued: December 4, 2002

Decided: February 6, 2003

Before MICHAEL, TRAXLER, and KING, Circuit Judges.

Affirmed by unpublished opinion. Judge Michael wrote an opinion in which Judge King concurred in part I and concurred in the result in part II.B. Judge Traxler wrote an opinion concurring in the judgment. Judge King wrote an opinion concurring in part and dissenting in part.

## COUNSEL

**ARGUED:** Vincent L. Gambale, Assistant United States Attorney, Steven D. Mellin, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellant. Michael William Lieberman, Assistant Federal Public Defender, Alexandria, Virginia, for Appellee. **ON BRIEF:** Paul J. McNulty,

United States Attorney, Matthew W. Friedrich, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellant. Frank W. Dunham, Jr., Federal Public Defender, Frances H. Pratt, Research & Writing Attorney, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia; Frank Salvato, Alexandria, Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

MICHAEL, Circuit Judge:

The government takes this interlocutory appeal to challenge the district court's in limine determination that six statements made to others by the missing victim in a federal kidnapping and murder case are inadmissible. The court affirms by a divided vote.

I conclude that the district court did not abuse its discretion in deciding that the statements are excludable under Federal Rule of Evidence 403 because their probative value is substantially outweighed by the danger of unfair prejudice. Judge Traxler has written a separate opinion concurring in the judgment to affirm and concluding that the statements are inadmissible under Rule 804(b)(6)'s forfeiture by wrongdoing exception to the hearsay rule. Judge Traxler would not reach the Rule 403 issue. Judge King has also written a separate opinion concurring in part and dissenting in part. He concurs in part I of my opinion (reciting the facts and procedural history) and in the result in part II.B (dealing with the two "Jay did it" statements). Judge King dissents, however, from the judgment to affirm the orders excluding the four "O.J. statements." He concludes that the O.J. statements are not excludable under Rule 403. He would remand, giving the government the opportunity to introduce the O.J. statements under Rule 804(b)(6) if it could prove, by a preponderance of the evidence, that the defendant engaged in wrongdoing that was intended to, and did, render his alleged victim unavailable as a witness.

## I.

Jay E. Lentz (Lentz) is charged with kidnapping and murdering his ex-wife, Doris Lentz (Doris), who disappeared on April 23, 1996. Specifically, a grand jury in the Eastern District of Virginia indicted Lentz for kidnapping resulting in death (count 1), *see* 18 U.S.C. § 1201(a); kidnapping (count 2), *see id.*; and interstate domestic violence (count 3), *see id.* § 2261(a)(2). The government is seeking the death penalty on count 1 and has filed the required notice. *See id.* § 3593(a). The district court suspended proceedings, which were several days into jury selection, when the government filed this interlocutory appeal. *See* 18 U.S.C. § 3731 (allowing the government to appeal an evidentiary ruling in a criminal case before jeopardy attaches).

The government's projected case is bottomed on facts relating to a bitter domestic relations and divorce dispute between Lentz and Doris. The two were married in 1989, and their only child, Julia, was born in 1991. Lentz filed for divorce in 1993, and a final divorce decree was entered in 1995. By early spring of 1996 Lentz and Doris were involved in hotly contested litigation concerning property division and child custody, support, and visitation. On March 29, 1996, several weeks before Doris disappeared, the family court ordered the garnishment of Lentz's wages to satisfy his child support obligations. At that time Lentz was also subject to a court order requiring him to pay Doris $28,000 for her share of certain marital property and, in addition, to pay her one-half of the proceeds from the anticipated sale of their residential property. Another hearing in the divorce case to deal with property and payment issues had been set for April 24, 1996, the day after Doris disappeared. Doris's disappearance enabled Lentz to keep all proceeds from the sale of the house, avoid the court-ordered buyout of other marital property, and gain custody of his daughter.

The government's theory is that Lentz murdered Doris to avoid the consequences of the divorce proceedings and to exact final revenge against her for her aggressive stance in the litigation. The government contends, based almost entirely on circumstantial evidence, that Lentz murdered Doris after luring her from Virginia, where she lived, to his house in Maryland. Just days before Doris's disappearance, Lentz allegedly told two witnesses in a conversation about his divorce pro-

ceedings, "I'll kill her [Doris] first before Julia is taken from me." On the evening of April 23, 1996, Doris told a friend that she was leaving to go to Lentz's house to pick up their daughter, Julia. At that time, however, Julia was still in Indiana visiting Lentz's parents. This indicates, according to the government, that Lentz lied to Doris in order to trick her into coming to his house that evening. The day before, on April 22, 1996, Lentz had contacted the realtor with whom he had listed his house to make sure that no prospective buyers would visit for several days. After Doris's disappearance Lentz made conflicting statements about whether he had seen Doris on April 23: although he told police that he had not seen his ex-wife on April 23, he told his daughter's babysitter that he had let Doris know that she should not come over to the house, "but she came anyways." On April 28, 1996, five days after Doris disappeared, police found her abandoned car in Washington, D.C. Blood stains on the passenger side contained Doris's DNA, and one spot of blood found in the car contained Lentz's DNA. The government has evidence that Doris was afraid of Lentz because he was abusive towards her and threatened her. This evidence includes six statements, set out in the next paragraph, that Doris made to others before her disappearance in which she indicated that Lentz had hinted that he might kill her or in which she expressed the belief that he might kill her.

On January 11, 2002, the government filed a motion *in limine* to admit a number of Doris's statements under various exceptions to the hearsay rule, including the forfeiture by wrongdoing exception under Fed. R. Evid. 804(b)(6). On May 14, 2002, the district court issued a comprehensive, seventy-six-page order that granted the government's motion in part and denied it in part. The government takes exception to the district court's exclusion of the following six statements: (1) Doris's statement to a pastor at her church, the Reverend Lauren Gough, that Lentz told her that "if O.J. [Simpson] can get away with it, so can I." (2) Doris's statement to another of her pastors, the Reverend Victoria Heard, that Lentz asked Doris if she was watching the O.J. Simpson trial and told her that "O.J. could happen again" and that if he (Lentz) got to her, "there would be no body." (3) Doris's statement to an Arlington County, Virginia, police officer that Lentz told her that "O.J. had the right idea." (4) Doris's statement to her boyfriend, Tim O'Brien, that Lentz told her that the O.J. Simpson case could happen again. (5) Doris's statement to nurse Ruth Colvin

(or Cauvin) that "if anything ever happens to me — Jay did it." (6) Doris's statement to nurse Ann Sarkes that "if she ever turned up dead — tell police Jay did it." (We refer to statements (1) through (4) as "the O.J." statements and to statements (5) and (6) as "the Jay did it" statements.)

The district court ruled that none of the six statements were admissible under Fed. R. Evid. 804(b)(6)'s forfeiture by wrongdoing exception. In the alternative, the court ruled that all six statements should be excluded under Rule 403 because their probative value is substantially outweighed by the danger of unfair prejudice. The government filed a motion for reconsideration, asking the district court to reconsider its Rule 403 determination and, in the alternative, to consider redactions to the statements. The district court denied the motion to reconsider on September 3, 2002, the day before the trial was scheduled to begin. On September 13, 2002, after jury selection had begun but before a jury was empaneled and sworn, the government invoked 18 U.S.C. § 3731 and filed this interlocutory appeal of the district court's orders excluding the six out-of-court statements made by Doris.

## II.

Again, the district court held that the six statements at issue were not admissible under Rule 804(b)(6)'s forfeiture by wrongdoing exception to the hearsay rule. The court went on to hold that even if the statements qualify under an applicable hearsay exception, they must still be excluded under Rule 403 because they pose an undue risk of unfair prejudice. The forfeiture by wrongdoing issue is a challenging one. We do not decide it, however, because we are divided in approach.

Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Fed. R. Evid. 403. On appeal we give substantial deference to a district court's decision to exclude evidence, and we will not reverse unless there is a clear abuse of discretion. *United States v. Achiekwelu,* 112 F.3d 747, 753 (4th Cir. 1997) (quotation omitted). A district court abuses its discretion in an evidentiary ruling only if it acts arbitrarily or irrationally. *Id.* This broad dis-

cretion extends as a matter of course to a district court's determination under Rule 403 that evidence is unfairly prejudicial. It must be kept in mind, however, that "[e]vidence that is highly probative invariably will be prejudicial to the defense," and legitimate "damage to a defendant's case is not a basis for excluding probative evidence." *United States v. Grimmond*, 137 F.3d 823, 833 (4th Cir. 1998). Unfair prejudice "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403 Advisory Committee's Note. Thus, exclusion is warranted when there is "a genuine risk that the emotions of the jury will be excited to irrational behavior, and this risk is disproportionate to the probative value of the offered evidence." *United States v. Wells*, 163 F.3d 889, 896 (4th Cir. 1998) (quotation omitted). In the end, a district court's Rule 403 decision to exclude evidence that is unduly prejudicial "should not be overturned except under the most extraordinary of circumstances." *United States v. Aramony*, 88 F.3d 1369, 1377 (4th Cir. 1996) (internal quotation omitted).

### A.

In evaluating the O.J. statements under Rule 403, the district court first considered their probative value. The statements, the court recognized, are probative of Doris's fear of Lentz and are "relevant to necessary elements of the charged offenses such as [Lentz's] intent." It also appears that the district court considered whether the government has other, less prejudicial, means of proof to establish the points it wanted to make through the O.J. statements. *See United States v. Lachman*, 48 F.3d 586, 593 (1st Cir. 1995) ("In applying Rule 403, it is plainly pertinent to consider whether a litigant has some alternative way to establish a fact that involves no (or at least a lesser) risk of prejudice . . . ."). In its comprehensive memorandum order the district court ruled admissible a number of Doris's statements that reflected her fear of Lentz and his threats against her. These include: (1) Doris's statements to one of her pastors, Rev. Heard, that she was very afraid of Lentz; (2) Doris's statements to her boyfriend that she was fearful, scared, and concerned that Lentz would kill her; (3) her deposition testimony (in the divorce proceedings) recounting her statements to others about Lentz's abusive behavior towards her; and (4) her reports to the police about Lentz's abuse and harassing telephone calls to her. The court will also admit some thirty hours of

recorded telephone conversations and messages between Lentz and Doris that reveal Lentz's hostility towards Doris after the two separated in 1991. These conversations and messages, the district court said, bear upon Lentz's intent and motive. Finally, with respect to Lentz's intent and motive, the district court was aware that the government has two witnesses who will testify that Lentz told them, in a conversation about his divorce, "I'll kill her [Doris] first before Julia is taken from me."

The district court carefully considered the probative value of the O.J. statements, the availability to the government of other evidence, and the potential for unfair prejudice if the statements were admitted. The court ultimately concluded:

> The probative value of [the O.J. statements] is substantially outweighed by the unfair highly prejudicial effect such statements could have on the jury's deliberations. Indeed, one would be hard pressed to find evidence more likely to excite the emotions of the jury and cause it to act irrationally than hearsay statements presented in a domestic kidnaping case laden with references to the infamous O.J. Simpson case.

Later, in denying the government's motion for reconsideration, the district court added that "[t]he O.J. Simpson case has become a short hand way to describe tragic domestic violence and the inflammatory inference of getting away with murder." The O.J. statements, the court held, were inadmissible under Rule 403.

The question of whether O.J. statements such as the ones here are admissible or inadmissible is a close one, at least for a trial court. On the one hand, a trial court might conclude that the O.J. Simpson case has lost its shock value and that any risk that references to O.J. Simpson would excite a jury to act irrationally would not outweigh the probative value of O.J. remarks made by a defendant to his victim. *Cf. United States v. Papajohn*, 212 F.3d 1112, 1121 (8th Cir. 2000) (concluding that the prosecutor's comparison of the defense to that used in the O.J. Simpson trial was not prejudicial); *People v. Thurston*, No. H022583, 2002 WL 984774, at *5-6 (Cal. App. 6 Dist. May 14, 2002) (unpublished opinion) (upholding the trial court's determination that

the prosecutor's reference to the O.J. Simpson case in a domestic violence prosecution was not unduly prejudicial and noting that the reference to Simpson was necessary to give meaning to the defendant's remarks to the victim that "O.J. got off").

On the other hand, a trial court might conclude, as did the district court here, that a reference to O.J. Simpson is modern-day shorthand for suggesting that someone has gotten away with murder; and, as a result, O.J. Simpson statements have an undue tendency to inflame a jury and suggest decision on an improper basis. *Cf. State v. Thompson*, 578 N.W.2d 734, 743 (Minn. 1998) (stating that "[no] purpose is served by comparing [defendant] to another [such as O.J. Simpson] charged with a notorious crime other than to attempt to impassion the jury"). Indeed, there is support for the district court's conclusion that O.J. remarks have become shorthand to describe getting away with murder, especially the murder of a domestic partner. *Cf. The Online Slang Dictionary*, at http://www.ocf.berkeley.edu/~wrader/slang/o.html (defining "OJ" as "to stab" or "to kill," as in "Go ahead, OJ them"). More important, there is support for the district court's conclusion that the O.J. Simpson case still excites public emotion. A poll taken by Zogby International in 2001, six years after the trial, reveals that many Americans remain fascinated by the Simpson case and still have strong feelings about it. The Zogby poll found that the public ranks the brutal double murder of Nicole Brown Simpson and Ron Goldman as one of America's greatest unresolved crimes. Finally, the poll found that seventy-two percent of Americans continue to believe that O.J. Simpson is guilty, despite his acquittal. *See* As Seen on This Morning's NBC Today Show: Truth or Conspiracy: The O.J. Case After Seven Years, Why Americans Are Still Divided Over Who Killed Nicole Brown Simpson and Ron Goldman (Aug. 7, 2001), at http://www.zogby.com/search/ReadNews.dbm?ID=442.

In deciding whether to affirm or reverse the district court's decision to exclude the O.J. statements under Rule 403, we must remember our limited role in reviewing an evidentiary ruling by a district court. We must give the ruling substantial deference, and we must not reverse it unless the district court has clearly abused its discretion by acting arbitrarily or irrationally. I see nothing arbitrary or irrational in the district court's decision to exclude the O.J. statements. The district court was painstaking in its consideration. The court weighed the pro-

bative value of the statements and took into account the other means of proof available to the government. The court expressed concern that the statements could excite the emotions of the jury, and there is data to support this concern. All in all, the district court concluded that the statements' potential for unfair prejudice substantially outweighs their probative value. I cannot say that the court abused its discretion in reaching this conclusion.

Judge King believes that the district court abused its discretion in excluding the O.J. statements under Rule 403. I have great respect for Judge King's views on questions of evidence, but I respectfully disagree with him in this instance. Judge King begins his Rule 403 discussion by concluding that Lentz's O.J. statements "threaten[ed], in substance, that 'I'll kill you and get away with it.'" *Post* at 12. The district court was concerned that the jury would automatically jump to the very same conclusion without any rational analysis. This assessment by the district court is not contrary to reason. In addition, I do not believe, as does Judge King, that the O.J. statements are necessary to the government's case. As I have already discussed, the government has a considerable amount of other evidence showing that Lentz threatened Doris, that he said he might kill her, and that she was afraid of him. Finally, Judge King appears to conclude that Lentz's O.J. statements cannot be excluded as unfairly prejudicial under Rule 403 because any prejudice "is entirely self-inflicted;" in other words, "he chose the words and he's stuck with them." *Post* at 12. Even though Lentz himself used the words in question, the issue of their admissibility must still be evaluated under Rule 403. *See United States v. Gartmon*, 146 F.3d 1015, 1022-23 (D.C. Cir. 1998); *United States v. Yarns*, 811 F.2d 454, 456 (8th Cir. 1987); *United States v. Qamar*, 671 F.2d 732, 734-35 (2d Cir. 1982). Judge King's dissent confirms that the Rule 403 question was a close one for the district court. But we give our district courts a wide berth to decide questions of admissibility. For that reason, I do not believe that the district court abused its discretion in keeping out the O.J. statements.

### B.

We must also consider the district court's determination that the two "Jay did it" statements should also be excluded under Rule 403. These are Doris's statements to the two nurses to the effect that if

anything happened to her, "Jay did it." First of all, as the district court noted, the statements are not admissible to prove the matter asserted, that is, if Doris was ever killed, Lentz would be the killer. On that score the statements were simply speculation by Doris about what might happen to her in the future. As the district court recognized, the statements are probative of Doris's fear of Lentz, but the government has a wealth of evidence to prove that point. The district court concluded that admission of the "Jay did it" statements would present a real danger of unfair prejudice. A jury, hearing that the victim had twice predicted her own demise at the hands of the defendant charged with her kidnapping and murder, could be moved to decide the case on sympathy and emotion. Accordingly, the district court did not abuse its discretion in excluding these statements under Rule 403 on the ground that their limited probative value was substantially outweighed by the danger of unfair prejudice.

### III.

The court affirms the district court's orders excluding the O.J. statements and the "Jay did it" statements.

*AFFIRMED*

TRAXLER, Circuit Judge, concurring in the judgment:

I concur in the judgment affirming the district court's exclusion of Ms. Lentz's hearsay statements, although not because I believe their prejudicial effect outweighs their probative value under Fed. R. Evid. 403. Because I would hold that the statements, which are concededly inadmissible under the hearsay rule at Fed. R. Evid. 802, are not admissible under the exception contained in Fed. R. Evid. 804(b)(6), I would not reach the Rule 403 issue at all.

The "forfeiture by wrongdoing" exception to the general prohibition against hearsay provides that, "if [a] declarant is unavailable as a witness," then "[a] statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness" is "not excluded by the hearsay rule." Fed. R. Evid. 804(b)(6). The govern-

ment argues that because Lentz murdered Mrs. Lentz to prevent her from testifying in an upcoming family court proceeding, her statements are admissible in his trial for her murder under this exception. I disagree.

Obviously, the "forfeiture by wrongdoing" exception allows for the admission of witness statements in a proceeding if the witness was murdered to prevent him or her from testifying in that same proceeding. *See United States v. Johnson*, 219 F.3d 349, 356 (4th Cir. 2000) (holding that the district court did not abuse its discretion in admitting statements of a murder victim under Rule 804(b)(6) in defendant's trial for drug conspiracy and murder in aid of racketeering where the defendant "murdered [the witness] at least in part to procure the unavailability of the only witness to his murder of" another man). Thus, for example, if Lentz murdered his wife to prevent her from testifying in their divorce and child custody proceedings, Mrs. Lentz's statements would be admissible in a family court proceeding pertaining to their domestic issues (provided, of course, that the state has a similar state evidentiary rule). Like the district court, however, I am unwilling to extend the Rule 804(b)(6) exception to allow for the wholesale introduction of hearsay statements made by a murder victim against the defendant in the federal trial for the witness's murder simply because the parties were involved in state court litigation at the time of the alleged murder. Rather, I interpret the Rule 804(b)(6) exception as being generally limited to the introduction of hearsay statements in the proceeding at which the deceased was expected by the assailant to testify.

Accordingly, I concur in a judgment to affirm the district court, but for a different reason. I would affirm the district court's exclusion of the statements solely on the basis that the hearsay statements are not admissible under the forfeiture by wrongdoing exception. Because the government's appeal is limited to the district court's rulings under Fed. R. Evid. 804(b)(6) and Fed. R. Evid. 403, I express no opinion as to whether the statements might have been admissible under any other exception to the hearsay rule.

KING, Circuit Judge, concurring in part and dissenting in part:

While I agree with Judge Michael that the district court was within its discretion in excluding the "Jay did it" statements under Rule 403,[1] I would reverse the court's exclusion of the O.J. statements. I would remand to give the Government an opportunity to prove, by a preponderance of the evidence, that Lentz "engaged . . . in wrongdoing that was intended to, and did, procure the unavailability of [Doris] as a witness" with respect to those statements. Fed. R. Evid. 804(b)(6).

Lentz himself chose to make reference to O.J. Simpson in his threats to Doris. The O.J. statements — threatening, in substance, that "I'll kill you and get away with it" — are highly probative of Lentz's commission and concealment of Doris's murder. They are plainly relevant and necessary to the Government's case; and to the extent that they are prejudicial to Lentz's defense, that prejudice is entirely self-inflicted. On the Rule 403 issue, I would say, put most simply, that "he chose the words and he's stuck with them."[2] To hold that a defendant's own threats are so egregiously prejudicial as to preclude their admission against him at trial would create a perverse result: As between two defendants who have made threats against the individuals in whose deaths they are subsequently charged, he who has made the more odious statements can, by virtue of the very extremity of his conduct, be shielded at trial from inferences deleterious to his case. By contrast, the defendant whose threats were comparatively milder may suffer the introduction of those statements against him. I would hold that the district court abused its discretion in excluding the O.J. statements under Rule 403.[3]

---

[1]I also agree with Judge Michael's recitation of the factual and procedural underpinnings of this appeal, as set forth in Part I of his opinion.

[2]Judge Michael is entirely correct that Lentz's statements must be evaluated under Rule 403. *Ante* at 9. My contention, however, is simply that Lentz is entitled to no special protection by virtue of the outrageousness of his conduct. *Cf. United States v. Gartmon*, 146 F.3d 1015, 1021 (D.C. Cir. 1998) ("Rule 403 does not provide a shield for defendants who engage in outrageous acts, permitting only the crimes of Caspar Milquetoasts to be described fully to a jury.").

[3]If Doris were available to testify against her ex-husband in his trial for attempted murder and kidnapping, I submit that no one could seriously

Because I see the O.J. statements as not properly excludable under Rule 403, I turn to whether those statements might be admissible under the Rule 804(b)(6) "forfeiture by wrongdoing" exception to the hearsay rule. While my friend Judge Traxler maintains that the forfeiture by wrongdoing exception is "generally limited to the introduction of hearsay statements in the proceeding at which the deceased was expected by the assailant to testify," *ante* at 11, I am unable to perceive any such limitation. By its plain terms, Rule 804(b)(6) renders admissible any statement that would otherwise be excluded under the hearsay rule — i.e., the hearsay objection is forfeited — if the statement is "offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." Fed. R. Evid. 804(b)(6). The forfeiture by wrongdoing exception is couched in general terms, and those terms do not confine the admissibility of a hearsay statement to the particular proceeding for which the wrongdoer intended to render the declarant unavailable.

Because Rule 804(b)(6) applies under the circumstances of this case, and because the probative value of the O.J. statements is not substantially outweighed by any danger of unfair prejudice, I would vacate the exclusion of the O.J. statements. I would remand to accord the Government an opportunity to prove, by a preponderance of the evidence,[4] that Lentz engaged in wrongdoing that was intended to, and did, render Doris unavailable as a witness. *See United States v. Scott*, 284 F.3d 758, 762 (7th Cir. 2002) (holding that trial court should use preponderance of evidence analysis to make threshold determination under Rule 804(b)(6) whether defendant engaged in wrongdoing that was intended to, and did, render declarant unavail-

---

contend that Lentz's threats against her would be so unfairly prejudicial as to be inadmissible. And the only distinction here — that Doris is not available to be placed on the witness stand and her testimony is now hearsay — has (if Rule 804(b)(6) is satisfied) been forfeited by Lentz's wrongdoing.

[4]In pursuing this effort before the trial court, the Government would not be bound by the Rules of Evidence. *See* Fed. R. Evid. 104(a); *cf. Bourjaily v. United States*, 483 U.S. 171, 181 (1987); *Precision Piping & Instruments, Inc. v. E.I. du Pont de Nemours & Co.*, 951 F.2d 613, 621 (4th Cir. 1991).

able as witness); *United States v. Dhinsa*, 243 F.3d 635, 653-54 (2d Cir.), *cert. denied*, 534 U.S. 897 (2001) (same); *United States v. Cherry*, 217 F.3d 811, 815 (10th Cir. 2000) (same); *United States v. Emery*, 186 F.3d 921, 927 (8th Cir. 1999) (same). If the Government can make such a showing, it is entitled to avail itself of the forfeiture by wrongdoing exception embodied in Rule 804(b)(6) and to use the O.J. statements against Lentz in his trial.

   With all respect to my distinguished colleagues, I dissent from the panel's judgment that the exclusion of the O.J. statements should be sustained.