OPINION
MICHAEL, Circuit Judge.
The government takes this interlocutory appeal to challenge the district court’s in limine determination that six statements made to others by the missing victim in a federal Mdnapping and murder case are inadmissible. The court affirms by a divided vote.
I conclude that the district court did not abuse its discretion in deciding that the statements are excludable under Federal Rule of Evidence 403 because their probative value is substantially outweighed by the danger of unfair prejudice. Judge Traxler has written a separate opinion concurring in the judgment to affirm and concluding that the statements are inadmissible under Rule 804(b)(6)’s forfeiture by wrongdoing exception to the hearsay rule. Judge Traxler would not reach the Rule 403 issue. Judge King has also written a separate opinion concurring in part and dissenting in part. He concurs in part I of *963 my opinion (reciting the facts and procedural history) and in the result in part II.B (dealing with the two “Jay did it” statements). Judge King dissents, however, from the judgment to affirm the orders excluding thé four “O.J. statements.” He concludes that the O.J. statements are not excludable under Rule 403. He would remand, giving the government the opportunity to introduce the O.J. statements under Rule 804(b)(6) if it could prove, by a preponderance of the evidence, that the defendant engaged in wrongdoing that was intended to, and did, render his alleged victim unavailable as a witness.
I.
Jay E. Lentz (Lentz) is charged with kidnapping and murdering his ex-wife, Doris Lentz (Doris), who disappeared on April 23, 1996. Specifically, a grand jury in the Eastern District of Virginia indicted Lentz for kidnapping resulting in death (count 1), see 18 U.S.C. § 1201(a); kidnapping (count 2), see id.; and interstate domestic violence (count 3), see id. § 2261(a)(2). The government is seeking the death penalty on count 1 and has filed the required notice. See id. § 3593(a). The district court suspended proceedings, which were several days into jury selection, when the government filed this interlocutory appeal. See 18 U.S.C. § 3731 (allowing the government to appeal an evidentiary ruling in a criminal case before jeopardy attaches).
The government’s projected case is bottomed on facts relating to a bitter domestic relations and divorce dispute between Lentz and Doris. The two were married in 1989, and their only child, Julia, was born in 1991. Lentz filed for divorce in 1993, and a final divorce decree was entered in 1995. By early spring of 1996 Lentz and Doris were involved in hotly contested litigation concerning property division and child custody, support, and visitation. On March 29, 1996, several weeks before Doris disappeared, the family court ordered the garnishment of Lentz’s wages to satisfy his child support obligations. At that time Lentz was also subject to a court order requiring him to pay Doris $28,000 for her share of certain marital property and, in addition, to pay her one-half of the proceeds from the anticipated sale of their residential property. Another hearing in the divorce case to deal with property and payment issues had been set for April 24, 1996, the day after Doris disappeared. Doris’s disappearance enabled Lentz to keep all proceeds from the sale of the house, avoid the court-ordered buyout of other marital property, and gain custody of his daughter.
The government’s theory is that Lentz murdered Doris to avoid the consequences of the divorce proceedings and to exact final revenge against her for her aggressive stance in the litigation. The government contends, based almost entirely on circumstantial evidence, that Lentz murdered Doris after luring her from Virginia, where she lived, to his house in Maryland. Just days before Doris’s disappearance, Lentz allegedly told two witnesses in a conversation about his divorce proceedings, “I’ll kill her [Doris] first before Julia is taken from me.” On the evening of April 23, 1996, Doris told a friend that she was leaving to go to Lentz’s house to pick up their daughter, Julia. At that time, however, Julia was still in Indiana visiting Lentz’s parents. This indicates, according to the government, that Lentz lied to Doris in order to trick her into coming to his house that evening. The day before, on April 22, 1996, Lentz had contacted the realtor with whom he had listed his house to make sure that no prospective buyers would visit for several days. After Doris’s disappearance Lentz made conflicting *964 statements about whether he had seen Doris on April 23: although he told police that he had not seen his ex-wife on April 23, he told his daughter’s babysitter that he had let Doris know that she should not come over to the house, “but she came anyways.” On April 28, 1996, five days after Doris disappeared, police found her abandoned car in Washington, D.C. Blood stains on the passenger side contained Doris’s DNA, and one spot of blood found in the car contained Lentz’s DNA. The government has evidence that Doris was afraid of Lentz because he was abusive towards her and threatened her. This evidence includes six statements, set out in the next paragraph, that Doris made to others before her disappearance in which she indicated that Lentz had hinted that he might kill her or in which she expressed the belief that he might kill her.
On January 11, 2002, the government filed a motion in limine to admit a number of Doris’s statements under various exceptions to the hearsay rule, including the forfeiture by wrongdoing exception under Fed.R.Evid. 804(b)(6). On May 14, 2002, the district court issued a comprehensive, seventy-six-page order that granted the government’s motion in part and denied it in part. The government takes exception to the district court’s exclusion of the following six statements: (1) Doris’s statement to a pastor at her church, the Reverend Lauren Gough, that Lentz told her that “if O.J. [Simpson] can get away with it, so can I.” (2) Doris’s statement to another of her pastors, the Reverend Victoria Heard, that Lentz asked Doris if she was watching the O.J. Simpson trial and told her that “O.J. could happen again” and that if he (Lentz) got to her, “there would be no body.” (3) Doris’s statement to an Arlington County, Virginia, police officer that Lentz told her that “O.J. had the right idea.” (4) Doris’s statement to her boyfriend, Tim O’Brien, that Lentz told her that the O.J. Simpson case could happen again. (5) Doris’s statement to nurse Ruth Colvin(or Cauvin) that “if anything ever happens to me — Jay did it.” (6) Doris’s statement to nurse Ann Sarkes that “if she ever turned up dead — tell police Jay did it.” (We refer to statements (1) through (4) as “the O.J.” statements and to statements (5) and (6) as “the Jay did it” statements.)
The district court ruled that none of the six statements were admissible under Fed. R.Evid. 804(b)(6)’s forfeiture by wrongdoing exception. In the alternative, the court ruled that all six statements should be excluded under Rule 403 because their probative value is substantially outweighed by the danger of unfair prejudice. The government filed a motion for reconsideration, asking the district court to reconsider its Rule 403 determination and, in the alternative, to consider redactions to the statements. The district court denied the motion to reconsider on September 3, 2002, the day before the trial was scheduled to begin. On September 13, 2002, after jury selection had begun but before a jury was empaneled and sworn, the government invoked 18 U.S.C. § 3731 and filed this interlocutory appeal of the district court’s orders excluding the six out-of-court statements made by Doris.
II.
Again, the district court held that the six statements at issue were not admissible under Rule 804(b)(6)’s forfeiture by wrongdoing exception to the hearsay rule. The court went on to hold that even if the statements qualify under an applicable hearsay exception, they must still be excluded under Rule 403 because they pose an undue risk of unfair prejudice. The forfeiture by wrongdoing issue is a chai *965 lenging one. We do not decide it, however, because we are divided in approach.
Rule 403 provides that “[although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.... ” Fed. R.Evid. 403. On appeal we give substantial deference to a district court’s decision to exclude evidence, and we will not reverse unless there is a clear abuse of discretion. United States v. Achiekwelu, 112 F.3d 747, 753 (4th Cir.1997) (quotation omitted). A district court abuses its discretion in an evidentiary ruling only if it acts arbitrarily or irrationally. Id. This broad discretion extends as a matter of course to a district court’s determination under Rule 403 that evidence is unfairly prejudicial. It must be kept in mind, however, that “[ejvidence that is highly probative invariably will be prejudicial to the defense,” and legitimate “damage to a defendant’s case is not a basis for excluding probative evidence.” United States v. Grimmond, 137 F.3d 823, 833 (4th Cir. 1998). Unfair prejudice “means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.” Fed.R.Evid. 403 Advisory Committee’s Note. Thus, exclusion is warranted when there is “a genuine risk that the emotions of the jury will be excited to irrational behavior, and this risk is disproportionate to the probative value of the offered evidence.” United States v. Wells, 163 F.3d 889, 896 (4th Cir.1998) (quotation omitted). In the end, a district court’s Rule 403 decision to exclude evidence that is unduly prejudicial “should not be overturned except under the most extraordinary of circumstances.” United States v. Aramony, 88 F.3d 1369, 1377 (4th Cir.1996) (internal quotation omitted).
A.
In evaluating the O.J. statements under Rule 403, the district court first considered their probative value. The statements, the court recognized, are probative of Doris’s fear of Lentz and are “relevant to necessary elements of the charged offenses such as [Lentz’s] intent.” It also appears that the district court considered whether the government has other, less prejudicial, means of proof to establish the points it wanted to make through the O.J. statements. See United States v. Lachman, 48 F.3d 586, 593 (1st Cir.1995) (“In applying Rule 403, it is plainly pertinent to consider whether a litigant has some alternative way to establish a fact that involves no (or at least a lesser) risk of prejudice — ”). In its comprehensive memorandum order the district court ruled admissible a number of Doris’s statements that reflected her fear of Lentz and his threats against her. These include: (1) Doris’s statements to one of her pastors, Rev. Heard, that she was very afraid of Lentz; (2) Doris’s statements to her boyfriend that she was fearful, scared, and concerned that Lentz would kill her; (3) her deposition testimony (in the divorce proceedings) recounting her statements to others about Lentz’s abusive behavior towards her; and (4) her reports to the police about Lentz’s abuse and harassing telephone calls to her. The court will also admit some thirty hours of recorded telephone conversations and messages between Lentz and Doris that reveal Lentz’s hostility towards Doris after the two separated in 1991. These conversations and messages, the district court said, bear upon Lentz’s intent and motive. Finally, with respect to Lentz’s intent and motive, the district court was aware that the government has two witnesses who will testify that Lentz told them, in a conversation about his divorce, “I’ll kill her [Doris] first before Julia is taken from me.”
The district court carefully considered the probative value of the O.J. statements, *966 the availability to the government of other evidence, and the potential for unfair prejudice if the statements were admitted. The court ultimately concluded:
The probative value of [the O.J. statements] is substantially outweighed by the unfair highly prejudicial effect such statements could have on the jury’s deliberations. Indeed, one would be hard pressed to find evidence more likely to excite the emotions of the jury and cause it to act irrationally than hearsay statements presented in a domestic kidnaping case laden with references to the infamous O.J. Simpson case.
Later, in denying the government’s motion for reconsideration, the district court added that “[t]he O.J. Simpson case has become a short hand way to describe tragic domestic violence and the inflammatory inference of getting away with murder.” The O.J. statements, the court held, were inadmissible under Rule 403.
The question of whether O.J. statements such as the ones here are admissible or inadmissible is a close one, at least for a trial court. On the one hand, a trial court might conclude that the O.J. Simpson case has lost its shock value and that any risk that references to O.J. Simpson would excite a jury to act irrationally would not outweigh the probative value of O.J. remarks made by a defendant to his victim. Cf. United States v. Papajohn, 212 F.3d 1112, 1121 (8th Cir.2000) (concluding that the prosecutor’s comparison of the defense to that used in the O.J. Simpson trial was not prejudicial); People v. Thurston, No. H022583, 2002 WL 984774, at *5-6 (Cal. App. 6 Dist. May 14, 2002) (unpublished opinion) (upholding the trial court’s determination that the prosecutor’s reference to the O.J. Simpson case in a domestic violence prosecution was not unduly prejudicial and noting that the reference to Simpson was necessary to give meaning to the defendant’s remarks to the victim that “O.J. got off’).
On the other hand, a trial court might conclude, as did the district court here, that a reference to O.J. Simpson is modern-day shorthand for suggesting that someone has gotten away with murder; and, as a result, O.J. Simpson statements have an undue tendency to inflame a jury and suggest decision on an improper basis. Cf. State v. Thompson, 578 N.W.2d 734, 743 (Minn.1998) (stating that “[no] purpose is served by comparing [defendant] to another [such as O.J. Simpson] charged with a notorious crime other than to attempt to impassion the jury”). Indeed, there is support for the district court’s conclusion that O.J. remarks have become shorthand to describe getting away with murder, especially the murder of a domestic partner. Cf. The Online Slang Dictionary, at http://www.ocf.berkeley.edu/ wrader/slang/ o.html (defining “OJ” as “to stab” or “to kill,” as in “Go ahead, OJ them”). More important, there is support for the district court’s conclusion that the O.J. Simpson case still excites public emotion. A poll taken by Zogby International in 2001, six years after the trial, reveals that many Americans remain fascinated by the Simpson case and still have strong feelings about it. The Zogby poll found that the public ranks the brutal double murder of Nicole Brown Simpson and Ron Goldman as one of America’s greatest unresolved crimes. Finally, the poll found that seventy-two percent of Americans continue to believe that O.J. Simpson is guilty, despite his acquittal. See As Seen on This Morning’s NBC Today Show: Truth or Conspiracy: The O.J. Case After Seven Years, Why Americans Are Still Divided Over Who Killed Nicole Brown Simpson and Ron Goldman (Aug. 7, 2001), at http://www.zogby.com/search/ReadNews.dbm?ID=442.
*967 In deciding whether to affirm or reverse the district court’s decision to exclude the O.J. statements under Rule 408, we must remember our limited role in reviewing an evidentiary ruling by a district court. We must give the ruling substantial deference, and we must not reverse it unless the district court has clearly abused its discretion by acting arbitrarily or irrationally. I see nothing arbitrary or irrational in the district court’s decision to exclude the O.J. statements. The district court was painstaking in its consideration. The court weighed the probative value of the statements and took into account the other means of proof available to the government. The court expressed concern that the statements could excite the emotions of the jury, and there is data to support this concern. All in all, the district court concluded that the statements’ potential for unfair prejudice substantially outweighs their probative value. I cannot say that the court abused its discretion in reaching this conclusion.
Judge King believes that the district court abused its discretion in excluding the O.J. statements under Rule 403. I have great respect for Judge King’s views on questions of evidence, but I respectfully disagree with him in this instance. Judge King begins his Rule 403 discussion by concluding that Lentz’s O.J. statements “threaten[ed], in substance, that ‘I’ll kill you and get away with it.’ ” Post at 969. The district court was concerned that the jury would automatically jump to the very same conclusion without any rational analysis. This assessment by the district court is not contrary to reason. In addition, I do not believe, as does Judge King, that the O.J. statements are necessary to the government’s case. As I have already discussed, the government has a considerable amount of other evidence showing that Lentz threatened Doris, that he said he might kill her, and that she was afraid of him. Finally, Judge King appears to conclude that Lentz’s O.J. statements cannot be excluded as unfairly prejudicial under Rule 403 because any prejudice “is entirely self-inflicted;” in other words, “he chose the words and he’s stuck with them.” Post at 969. Even though Lentz himself used the words in question, the issue of their admissibility must still be evaluated under Rule 403. See United States v. Gartmon, 146 F.3d 1015, 1022-23 (D.C.Cir. 1998); United States v. Yarns, 811 F.2d 454, 456 (8th Cir.1987); United States v. Qamar, 671 F.2d 732, 734-35 (2d Cir.1982). Judge King’s dissent confirms that the Rule 403 question was a close one for the district court. But we give our district courts a wide berth to decide questions of admissibility. For that reason, I do not believe that the district court abused its discretion in keeping out the O.J. statements.
B.
We must also consider the district court’s determination that the two “Jay did it” statements should also be excluded under Ride 403. These are Doris’s statements to the two nurses to the effect that if anything happened to her, “Jay did it.” First of all, as the district court noted, the statements are not admissible to prove the matter asserted, that is, if Doris was ever killed, Lentz would be the killer. On that score the statements were simply speculation by Doris about what might happen to her in the future. As the district court recognized, the statements are probative of Doris’s fear of Lentz, but the government has a wealth of evidence to prove that point. The district court concluded that admission of the “Jay did it” statements would present a real danger of unfair prejudice. A jury, hearing that the victim had twice predicted her own demise at the hands of the defendant charged with *968 her kidnapping and murder, could be moved to decide the case on sympathy and emotion. Accordingly, the district court did not abuse its discretion in excluding these statements under Rule 403 on the ground that their limited probative value was substantially outweighed by the danger of unfair prejudice.
III.
The court affirms the district court’s orders excluding the O.J. statements and the “Jay did it” statements.

AFFIRMED.