**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 07-4544

UNITED STATES OF AMERICA,

             Plaintiff - Appellee,

     v.

KEVIN L. GEDDINGS,

             Defendant - Appellant.

Appeal from the United States District Court for the Eastern
District of North Carolina, at Raleigh.   James C. Dever III,
District Judge.  (5:06-cr-00136-D)

Before NIEMEYER and SHEDD, Circuit Judges, and Patrick Michael
DUFFY, United States District Judge for the District of South
Carolina, sitting by designation.

Argued:  January 31, 2008          Decided:  May 19, 2008

Affirmed by unpublished opinion.  Judge Shedd wrote the opinion, in
which Judge Niemeyer and Judge Duffy joined.

**ARGUED:** Jonathan I. Edelstein, New York, New York, for Appellant.
John Stuart Bruce, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh,
North Carolina, for Appellee.   **ON BRIEF:** Abraham Abramovsky,
FORDHAM UNIVERSITY, School of Law, New York, New York, for
Appellant.  George E. B. Holding, United States Attorney, Anne M.
Hayes, Assistant United States Attorney, Dennis M. Duffy, Assistant
United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY,
Raleigh, North Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

SHEDD, Circuit Judge:

A federal jury convicted Kevin Geddings of five counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 1346 based on his failure to disclose a conflict of interest as a North Carolina lottery commissioner. The district court sentenced Geddings to 48-months' imprisonment, and he now appeals his conviction and sentence. We affirm.

I.

Viewing the evidence in the light most favorable to the government, see Glasser v. United States, 315 U.S. 60, 80 (1942), the following are the facts. Geddings has long been involved in the promotion of lotteries. In 1998, South Carolina gubernatorial candidate Jim Hodges hired Geddings' public relations/political consultant firm, Geddings and Phillips Communications, LLC ("Geddings/Phillips") for his campaign. Whether South Carolina should adopt a lottery became a focus of that campaign, and Geddings created advertisements highlighting incumbent Governor David Beasley's opposition to the lottery. After Hodges defeated Beasley, Geddings served as his chief of staff and later participated in his reelection campaign.

During South Carolina's lottery debate, Geddings developed a business relationship with lottery vendor Scientific Games

3

International, Inc. ("Scientific Games").[1] Geddings received $163,545 from Scientific Games over the course of their relationship, which extended from 2000 to 2005. In 2000, Scientific Games hired Geddings to create advertisements supporting a referendum to amend the South Carolina Constitution and allow the creation of a lottery. On October 5, 2001, Scientific Games contributed $35,000 to South Carolinians for an Effective Lottery, LLC ("SC Effective Lottery"), a for-profit organization formed by Geddings. On October 22, 2001, Geddings emailed a negative article regarding GTech's operation of the Texas lottery to the chairman of the South Carolina Lottery Commission and noted: "[j]ust wanted you to be ready for an onslaught of bad press if Gtech [sic] wins SC contract." J.A. 3996. Three days later, SC Effective Lottery distributed $29,500 to Geddings/Phillips. On October 30, 2001, Scientific Games received the on-line portion of the South Carolina lottery contract.

Geddings moved to North Carolina in 2003, and he continued his relationship with Scientific Games. In 2004 and 2005, Scientific Games retained Geddings to promote a lottery in North Carolina. Geddings prepared elected officials for debates and produced advertisements in support of the lottery. In July 2005, Alan

---

[1]According to the record, Scientific Games holds the market-leading position in scratch or instant lottery tickets and is second in online lottery games. Its primary competitor, GTECH Corporation ("GTech"), leads in online lottery games.

Middleton, Scientific Games' vice president for government relations, notified his accounting department that Scientific Games would likely pay Geddings $5,000 per month for the next 6-18 months.[2] North Carolina adopted a lottery in August 2005.

In September 2005, Geddings sought appointment to the nine-member North Carolina Lottery Commission ("Lottery Commission"). He emailed Scientific Games' lobbyist Meredith Norris and told her to keep him in mind if she wanted "a foot soldier to serve [on the Lottery Commission] who will be loyal to the Speaker." J.A. 3224. Norris had formerly worked for James B. Black, Speaker of the North Carolina House of Representatives. On September 23, 2005, Speaker Black appointed Geddings to the Lottery Commission.

The executive order establishing the North Carolina Board of Ethics ("Ethics Board") requires public officials to "fully disclose any potential conflict of interest or appearance of conflict." N.C. Exec. Order No. 76 (2005). After his appointment, Geddings submitted a "Long Form" Statement of Economic Interest ("Ethics Form") to the Ethics Board. Geddings provided no response to Question 16, which is a broad catch-all question requiring the disclosure of conflicts of interest. Specifically, Question 16 states:

> Having read the Order in general and the 'Rules of Conduct for Public Officials' in particular, provide any

---

[2]Middleton is a close friend of Geddings who previously worked for Scientific Games in South Carolina as a consultant.

5

other information which a reasonable person would conclude is necessary or helpful either to carry out the purposes of the Order or to fully disclose any potential conflict of interest or appearance of conflict. Identify any conflicts or potential conflicts you may have that are not fully or adequately covered elsewhere in this form. Include an explanation of how you would propose to resolve any conflicts or potential conflicts.

J.A. 3218. After the Ethics Board requested additional information, Geddings supplied the following answer, which indicated his friendship with Middleton, but omitted his financial relationship with Scientific Games:

> I have a longstanding friendship and previous business relationship with Mr. Alan Middleton, a vice president with Scientific Games Corp. a potential N.C. Education Lottery vendor. Mr. Middleton and I have been friends since 1987. Between 2000 and 2001 Mr. Middleton's company, Carolina Public Affairs sublet office space from me. In 2002, he joined Scientific Games. I currently have no business relationship with Mr. Middleton, although he remains a friend.

> I should note as well, that as a former chief of staff to the Governor of South Carolina, I helped with that state's lottery start-up and enjoyed several opportunities to meet privately with GTech staff and representatives, including Mr. Don Sweitzer, Mr. Ted Riley and Mr. Chris Shaban. I have learned much from listening to the 'lessons learned' by executives from both major lottery system companies.

> In 2000, my company, Geddings & Phillips Communications, LLC also conducted focus groups of potential lottery customers in South Carolina for a lottery vendor company known then as IGT-Anchor Gaming. IGT-Anchor Gaming was later purchased by Scientific Games.

> My company, Geddings & Phillips Communications, along with my two radio stations WXNC-AM in Monroe, NC and WKMT-AM in Kings Mountain, NC have no current business relationships with any lottery vendor. Although I am in the process of selling my two radio stations, I pledge to

6

> not accept any lottery advertising contracts for these stations or any others I may own during my term on the Education Lottery Commission.
>
> In addition, to avoid even the "appearance" of unfair vendor consideration, I will not vote on any final vendor contract award that involves Scientific Games or GTech.

J.A. 3229. Based on the revised Ethics Form, the Ethics Board reported on October 12, 2005, to Speaker Black and to the Lottery Commission that Geddings did not have an actual conflict of interest but had "the potential for a conflict of interest." J.A. 3221-22. Had Geddings disclosed his financial relationship with Scientific Games, the Ethics Board would have concluded that he had an actual conflict of interest. J.A. 1178.

After his appointment as a commissioner, Geddings continued a relationship with Scientific Games. He emailed his secretary on September 26, 2005, and instructed her never to acknowledge by phone that Scientific Games "is a client." J.A. 3856 (emphasis added). On October 7, 2005, Scientific Games paid him $9,500. Three days later, Geddings' secretary forwarded him the invoice for the month of October for submission to Scientific Games.

Geddings kept in almost daily contact with Middleton. He communicated with Middleton even after the Lottery Commission adopted a policy proposed by Geddings that prohibited lottery commissioners from meeting individually with lottery vendors. Geddings was appointed to the Lottery Commission personnel committee on October 4, 2005. On that same day, when such

7

information was confidential, Geddings informed Middleton of the membership of the personnel committee. The composition of the committee did not become publicly available until October 6, 2005.

Although Geddings had recused himself from lottery vendor selection, he circulated negative articles regarding GTech, as he had done in South Carolina.[3] He sent one article regarding allegations of corruption against GTech in Pennsylvania to the Chairman of the Lottery Commission, Dr. Charles Sanders, with a note: "The press everywhere loves these stories." J.A. 3896. He sent another article detailing allegations of corruption in GTech's operation of the Texas lottery to Chairman Sanders' assistant, with a note: "It's worth reading just to see what 'ugly' issues can emerge with lottery operations over time." J.A. 4201.

The United States Attorney's Office for the Eastern District of North Carolina began an investigation related to the passage of the North Carolina lottery and requested certain records from Scientific Games around October 26, 2005. In response to that inquiry, Scientific Games collected records of all payments made by Scientific Games to Geddings over the course of their relationship. Ira Raphaelson, outside counsel to Scientific Games, asked Geddings if he had informed the Lottery Commission of his receipt of these payments. Geddings stated that he had not disclosed receiving the

---

[3]The Executive Director of the Ethics Board, Perry Newson, stated to the Lottery Commission that such a recusal prohibited indirect lobbying.

8

payments and that if he had, he would not have become a lottery commissioner. Furthermore, Geddings told Raphaelson that if Scientific Games turned over records of the payments that he would be "done" as a lottery commissioner. J.A. 1090. Raphaelson stated that Scientific Games intended to provide records of the payments to the United States Attorney's Office. Four days later on November 1, 2001, Geddings resigned from the Lottery Commission.

Geddings was indicted for using the mails and wires to execute a scheme to defraud the citizens of North Carolina of his honest services in violation of §§ 1341 and 1346. The indictment charges that Geddings concealed his conflict of interest with Scientific Games and aided that company's efforts to obtain a contract from North Carolina to operate the state's lottery. The jury convicted Geddings of five counts of mail fraud,[4] based on the following five mailings: (1) a letter, which the Governor of North Carolina mailed to appoint Geddings to the Lottery Commission; (2) Geddings' Ethics Form, which he sent to the Ethics Board; (3) a copy of the Ethics Board's finding that Geddings had no actual conflict of interest, which the Ethics Board mailed to Chairman Sanders; (4) a copy of the Ethics Board's finding that Geddings had no actual conflict of interest, which the Ethics Board mailed to Geddings; and (5) Geddings' oath of office, which he sent to the Governor of North Carolina.

---

[4]The jury acquitted Geddings of wire fraud.

At sentencing, the district court used U.S.S.G. § 2C1.1 to determine Geddings' base offense level of 14. Geddings received a four-level enhancement for being a high-level public official and a two-level enhancement for obstruction of justice, resulting in a total offense level of 20. See U.S.S.G. § 3C1.1; U.S.S.G. § 2C1.1(b)(3). Because Geddings' criminal history placed him in Category I, the advisory Sentencing Guideline range was 33-41 months. After considering the 18 U.S.C. § 3553(a) factors, the district court applied a seven-month upward variance, for a total sentence of 48 months.

## II.

Geddings first argues that the government presented insufficient evidence to support his conviction for mail fraud. In reviewing such a claim, "[t]he verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser, 315 U.S. at 80. Substantial evidence is "evidence which a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." United States v. Newsome, 322 F.3d 328, 333 (4th Cir. 2003) (quotation omitted).

The federal mail fraud statute prohibits using the mails[5] for the purpose of executing "any scheme or artifice to defraud." §

---

[5]Geddings does not contest the mailings in this case.

10

1341. Congress defined "scheme or artifice to defraud" to include "a scheme or artifice to deprive another of the intangible right of honest services." § 1346. Here, Geddings executed such a scheme by concealing his conflict of interest with Scientific Games and acting for its benefit as a lottery commissioner.[6]

Geddings' conflict of interest resulted from a substantial financial relationship with Scientific Games, which he concealed when submitting his Ethics Form. Scientific Games paid Geddings a total of $163,545, including $24,500 the year he became a lottery commissioner, including $9,500 after he was appointed to the Lottery Commission. As a lottery commissioner, Geddings instructed his secretary to never acknowledge that Scientific Games "is a client." J.A. 3856 (emphasis added). Regarding the concealment of his conflict of interest, Geddings stated to Raphaelson that he "did not disclose [his] work for Scientific Games" on his Ethics Form because if he had made such a disclosure he "wouldn't have gotten the position [on the Lottery Commission]." J.A. 1090.

---

[6]Geddings argues that the government must demonstrate that he received personal gain to sustain his conviction under §§ 1341 and 1346. Neither the statute nor our case law requires that a defendant receive personal gain. See generally United States v. Bryan, 58 F.3d 933 (4th Cir. 1995) (upholding a conviction with no evidence of personal gain) abrogated in part on other grounds by United States v. O'Hagan, 521 U.S. 642, 650 (1997). To the extent Geddings bases his argument on the panel opinion in United States v. Mandel, 591 F.2d 1347 (4th Cir. 1979), on rehearing, 602 F.2d 653 (4th Cir. 1979)(en banc), that panel opinion has no legal effect. Under Fourth Circuit rules, "[g]ranting of rehearing en banc vacates the previous panel judgment and opinion." 4th Cir. R. 35(c).

After becoming a lottery commissioner, Geddings took actions benefiting Scientific Games. Before the Lottery Commission awarded North Carolina's lottery vendor contract, Geddings distributed to Chairman Sanders articles critical of Scientific Games' primary competitor, GTech.[7] He kept in almost daily contact with Middleton, and continued to communicate with him even after the Lottery Commission adopted a policy prohibiting members from individually meeting with lottery vendors. Furthermore, he provided confidential information to Middleton identifying the membership of the Lottery Commission's personnel committee.

In short, a reasonable jury could find beyond a reasonable doubt that Geddings deprived the citizens of North Carolina of his honest services in violation of §§ 1341 and 1346.[8]

---

[7]Geddings argues that the articles were not negative, but Chairman Sanders testified that he interpreted them to be negative.

[8]Geddings contends that §§ 1341 and 1346 are unconstitutionally vague as applied to him. We find that the language of the statute provides notice of the wrongfulness of Geddings' conduct and adequately prevents arbitrary enforcement. United States v. Klecker, 348 F.3d 69, 71 (4th Cir. 2003). (explaining that the constitutional vagueness inquiry examines both public notice and arbitrary enforcement).

Geddings also challenges the district court's admission of testimony for the government, and the district court's denial of Geddings' request for surrebuttal. We review these rulings for abuse of discretion and find no error. See United States v. Achiekwelu, 112 F.3d 747, 753 (4th Cir. 1997).

12

III.

Geddings next challenges the reasonableness of his 48-month sentence. We review a district court's imposition of a sentence for abuse of discretion. United States v. Pauley, 511 F.3d 468, 473 (4th Cir. 2007)(citing Gall v. United States, 128 S. Ct. 586, 596 (2007)).

We first review for procedural errors, such as "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence -- including an explanation for any deviation from the Guidelines range." Gall, 128 S.Ct. at 597. Next, we consider the substantive reasonableness of the sentence. Id. "Substantive reasonableness review entails taking into account the totality of the circumstances, including the extent of any variance from the Guidelines range." Pauley, 511 F.3d at 473. While we may presume a sentence within the Guidelines range to be reasonable, we may not presume a sentence outside the range to be unreasonable. Id. Moreover, we must give due deference to the district court's decision that the § 3553(a) factors justify imposing a sentence outside the Guidelines range and to its determination regarding the extent of any variance. Id. at 473-74. Even if we would have reached a different sentencing result on our own, this fact alone

13

is not sufficient to justify reversal of the district court.  Id. at 474.

The district court used U.S.S.G. § 2C1.1 to determine Geddings' base offense level of 14.  Geddings argues that the district court should have applied § 2C1.3 because that section applies to conflict of interest offenses.  We find no error because the Guidelines' statutory index lists § 2C1.1 as the section corresponding to a violation of § 1341.

The district court notified the parties that it was considering an upward variance from the advisory 33-41 month Guideline range.  In its 30-page order imposing a seven-month upward variance, the district court analyzed all the § 3553 factors, including the fact that Geddings' wife has type I diabetes and that his son suffers from autism.  Based on the record, the district court determined that two factors in particular supported an upward variance: (1) the need for deterrence, and (2) the harm caused to the lottery.  In light of all the facts of this case, we conclude that the district court did not abuse its discretion in applying a seven-month upward variance and sentencing Geddings to 48-months' imprisonment.

14

IV.

We affirm Geddings' conviction for five counts of mail fraud and his 48-month sentence.

AFFIRMED